UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GARY SADLER, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL CASE NO.: |
| | : | 3-07-cv-1316 (CFD) |
| THERESA LANTZ, ET AL., | : | |
|     Defendants. | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT
FILED BY DEFENDANTS MURPHY AND STOLFI**

The plaintiff Gary Sadler, incarcerated at MacDougall Correctional Institution ("MacDougall"), commenced this civil rights action *pro se* against a number of Connecticut Department of Correction officials for a number of different claims, including inadequate medical attention and insufficient legal assistance. The claim that is the subject of this opinion concerns whether prison officials may prohibit inmates from receiving blank greeting cards in their mail. In claim four of the amended complaint Sadler claims that MacDougall Warden Murphy and Correctional Officer Stolfi violated his First Amendment right to freedom of expression and to receive incoming mail when they applied State of Connecticut Department of Correction Administrative Directives to reject correspondence addressed to him which included a blank greeting card.[1] Pending before the court is a motion for summary judgment filed by defendants Murphy and Stolfi. For the reasons that follow, the motion is granted.

---

[1] Claim four of the amended complaint originally included an allegation that Commissioner Theresa Lantz, Warden Murphy and Correctional Officer Stolfi improperly adopted that Administrative Directive and that Commissioner Lantz also unlawfully approved that Directive. On September 26, 2009, the court dismissed the allegations against defendants Lantz, Murphy and Stolfi relating to the alleged improper adoption of that Administrative Directive as well as all other allegations against defendant Lantz set forth in claim four of the amended complaint. Thus, no claims remain pending against defendant Lantz. *See* Rul. Pending Mots., Doc. No. 116.)

**I.      Standard of Review**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  *See* Rule 56(c),  Fed. R. Civ. P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The moving party may satisfy this burden by demonstrating the lack of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

A court must grant summary judgment if the pleadings, discovery materials on file and any affidavits show that there is no genuine issue as to any material fact.  *See Miner v. Glen Falls*, 999 F.2d 655, 661 (2d Cir. 1993).  A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248.

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must do more than vaguely assert "the existence of some unspecified disputed material facts" or present "mere speculation or conjecture."  *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation marks and citations omitted).  The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him.  *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

The court resolves all ambiguities and "draw[s] all permissible factual inferences in favor of the" nonmoving party.  *Patterson v. County of Oneida, NY*, 375 F.3d 206, 219 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable

inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (citations omitted).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. See *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II.   Facts[2]

The plaintiff is serving a thirty-year State of Connecticut sentence for manslaughter and was confined at MacDougall during 2007. MacDougall is a high security facility.

---

[2] The facts are taken from defendants' Local Rule 56(a)1 Statement along with the attached exhibits and affidavits. [*See* Docs. Nos. 213, 209, 212.] Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. *See* D. Conn. L. Civ. R. 56(a)2 & 56(a)3.

With their motion for summary judgment, defendants filed a Notice to Pro Se Litigant [Doc. No. 206] informing the plaintiff of his obligation to respond to the motion for summary judgment and of the contents of a proper response. The court permitted the plaintiff until September 19, 2011 to file his response to the motion for summary judgment. To date, the plaintiff has not filed his response. Because the plaintiff has not filed a Local Rule 56(a)2 Statement, the facts in the defendants' Local Rule 56(a)1 Statement are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2.").

The plaintiff had previously filed a motion to stay action on this summary judgment motion [Dkt. #231]. That motion was denied on August 30, 2011 [Dkt. #287] and a response was ordered to be filed by September 19, 2011. None was filed.

3

Peter J. Murphy has been the Warden of MacDougall since April 2007. He has attended courses at the training academy for the State of Connecticut Department of Correction ("DOC") as well as the National Institute of Corrections. These courses have included training on security issues, safety and management of inmates and safety of the public.

Correctional Officer Stolfi has been employed by the DOC for over nine years. Part of his training to become a correctional officer included a month-long course of general training at DOC's training academy and additional instruction on inspection and review of incoming and outgoing inmate mail. DOC's Security Division has certified Officer Stolfi as a "phone monitor." As a phone monitor, Officer Stolfi is also certified to inspect and review inmate mail. At MacDougall, Officer Stolfi completed a course on reviewing and inspecting incoming and outgoing inmate mail. This course also involved training in safety and security concerns related to the inspection and review of inmate mail.

On May 15, 2007, Officer Stolfi was inspecting incoming inmate mail as part of his responsibilities as phone monitor at MacDougall. Officer Stolfi was checking incoming inmate mail for materials that might compromise the safety and security of the facility, including contraband. When Officer Stolfi inspected a letter mailed to the plaintiff, he found a blank greeting card and laminated photographs in the envelope with the correspondence. Officer Stolfi completed a "Returned Letter or Funds Notification," indicating that the correspondence included unauthorized enclosures, and returned those materials to their sender. The plaintiff does not challenge the rejection of the laminated photographs.

4

On May 29, 2007, the plaintiff submitted an Inmate Request Form in an attempt to informally resolve the rejection of the blank greeting card.  On June 4, 2007, a DOC reviewer sent the plaintiff a written response indicating that blank greeting cards had to be purchased in the commissary and laminated pictures were not permitted in the prison facility.  The reviewer informed Sadler that the correspondence as well as the photographs and greeting card had been returned to its sender.  The sender was listed on the Returned Letter or Funds Notification as "Sadler," 1789 Pembroke Street, Bridgeport, CT 06608.

On June 4, 2007, the plaintiff filed a Level 1 Inmate Grievance noting that the Returned Letter or Funds Notification did not indicate how the blank greeting cards and photographs posed a threat to security.  On June 28, 2007, Warden Murphy denied the Grievance and stated that the items were properly rejected pursuant to Administrative Directive 10.7(4)F because contraband items were enclosed with the correspondence addressed to Sadler.

On July 2, 2007, the plaintiff filed a Level 2 Inmate Grievance appeal of the denial of the Level 1 Grievance.  On July 9, 2007, DOC District Administrator Wayne T. Choinski denied the appeal.

DOC Administrative Directive 6.10 ("Administrative Directive 6.10"), which was in effect at the time of the rejection of the card, provided that an inmate "may possess only that property authorized for retention upon admission to the facility, issued while in custody, purchased in the facility commissary, or approved at the facility in accordance with this Administrative Directive."  *Id.* at 6.10(1). Contraband is defined as "anything not authorized to be in an inmate's possession; . . . "  *Id.* at 6.10(3)B.  The main

5

purpose of Administrative 6.10(1) is to minimize the opportunity for contraband to be sent to inmates from individuals outside of prison. In addition, the directive serves to minimize the time spent by correctional staff in searching correspondence.

Administrative Directive 10.7, which was also in effect at the time of the rejection of items mailed to the plaintiff, provided that:

> All incoming general correspondence shall be opened and inspected for contraband and money . . . All incoming general correspondence may be rejected if such review discloses correspondence or material(s) which would reasonably jeopardize legitimate penological interests, including, but not limited to, material[s] which contain or concern: (a) the transport of contraband in or out of the facility . . . Incoming general correspondence containing any of the foregoing may be restricted, confiscated, returned to the sender, retained for further investigation, referred for disciplinary proceedings or forwarded to law enforcement officials.

*Id.* at 10.7(4)F(1). These Directives provided the basis for the prohibition of blank greeting cards.

The defendants have presented affidavits that state that the blank or unsigned greeting card found enclosed in the correspondence to the plaintiff was considered to be contraband because such cards could be used to transport drugs or needles into the prison facility by melting drugs onto the card or concealing the drugs or needles in the folds or layers of the paper material of the card.[3]

For example, Captain Michael E. Beaudry has been a Security Risk Group/Investigator/ Intelligence Coordinator at MacDougall since 2003. In this position, Captain Beaudry has supervised the mail room and mail handlers at MacDougall. In

---

[3] Apparently, the receipt of signed greeting cards does not create such a risk because the sender is identified, and the number of such cards is limited.

the last two to three years, Captain Beaudry has observed or investigated narcotics and needles concealed in cards sent to inmates at MacDougall.

Blank greeting cards sent to an inmate apparently could also be used by that inmate for barter, trade or gambling with other inmates. Bartering and gambling are not permitted at MacDougall because of the problems these activities create. Gary S. Wright has been the Deputy Warden at MacDougall since 2009. As the Deputy Warden, he reviews all incident reports, including reports of inmate fights and assaults. He stated that he is aware of incidents at MacDougall involving inmate fights over items that had been bartered.

Captain Beaudry has investigated inmate fights or verbal arguments involving the bartering of items of personal property that used to be permitted to be sent to inmates from individuals outside of prison. His affidavit supports the view of Deputy Warden Wright.

It is important to note that blank greeting cards may, however, be purchased from the prison commissary. On May 15, 2007, the prison commissary at MacDougall sold stationery, envelopes, post cards, greeting cards and postage. Inmates may use money from their inmate accounts to purchase items, including, stationery, post cards and greeting cards from the prison commissary. Family members may add deposits to those accounts.

### III.    Discussion

Defendants Murphy and Stolfi move for summary judgment on two grounds. They argue that (1) they did not violate the plaintiff's First Amendment rights because the administrative directives upon which they relied to reject the blank greeting cards

mailed to the plaintiff were reasonably related to legitimate penological interests and (2) they are entitled to qualified immunity.

It is well settled that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *O'Lone v. Estate of Ahmad Uthman Shabazz*, 482 U.S. 342, 348 (1987) (internal quotations omitted)(internal citations omitted). Inmates rights, however, are subject to limitations and restrictions due to the fact of their confinement and the legitimate goals and policies of correctional facilities. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979).

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court established that restrictive prison regulations, including restrictions on First Amendment rights, are "valid if [they are] reasonably related to legitimate penological interests [and] . . . [are not] an exaggerated response to prison concerns." *Id.* at 89-90. *Turner* set forth four factors for assessing reasonableness of a regulation. First, is there a "'valid, rational connection'" between the prison regulation and a legitimate governmental interest put forward to justify it ." Second, are there "alternative means of exercising the right that remain open to prison inmates." Third, what impact will accommodation of the asserted right" have on prison staff, "other inmates and on the allocation of prison resources generally." And, fourth, are there "ready alternatives" that completely "accommodate[] the prisoner's rights at de minimus cost to valid penological interests." *Turner*, 482 U.S. at 89-91 (internal citations omitted). The burden is on the inmate to disprove the validity of the regulation at issue. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2008) (citation omitted).

### A.     First Factor

Administrative Directives 10.7 and 6.10 are neutral in character.  They ban property sent to inmates from outside of prison without consideration of content.  There is no indication that the defendants' policy pursuant to these directives suppress inmate expression, but are concerned with increasing safety and alleviating the security issues posed by certain items being mailed to inmates from outside of prison.

The defendants have submitted evidence indicating that the purposes of Administrative Directives 6.10 and 10.7 were to prevent unauthorized bartering and smuggling of contraband through the assistance of third parties outside the prison.  The defendants have represented that drugs and weapons, such as needles and razor blades, could be inserted into the folds of blank greeting cards.  Drugs could also be melted onto the card itself.  In addition, bartering may result in disagreements among inmates with the risk of violence.

These objectives and their connection to Administrative Directives 6.10 and 10.7 were substantiated by, among other submissions, the Affidavit of Warden Murphy.  (*See* Mem. Supp. Mot. Summ. J, Murphy Aff. ¶¶ 10-11, 18-20.)  Deference is owed to the professional judgment of Warden Murphy as reflected in his affidavit.  *See Beard v. Banks*, 548 U.S. 521, (2006) (citing *Overton*, 539 U.S. at 132).  Applying the first *Turner* factor, the Court concludes that Administrative Directives 6.10 and 10.7, as applied here, have a rational connection to the identified safety and security issues associated with bartering and the inmate receipt of contraband in the form of drugs and potential weapons.

In sum, the defendants have identified legitimate, neutral prison interests served

by their application of Administrative Directives 6.10 and 10.7.  They supported these prison interests with evidence of professional judgment which is entitled to deference.  Accordingly, the defendants have met the first *Turner* factor.

    **B.**    **Second Factor**

In considering alternative means available to an inmate for exercising a right restricted by prison regulation, the Supreme Court has emphasized that the "alternatives 'need not be ideal ... they need only be available." *Overton*, 539 U.S. at 135.  The defendants have shown that the plaintiff could have purchased greeting cards from the commissary at MacDougall.  In addition, if the plaintiff lacked funds to purchase the cards from the prison commissary, his family members could have deposited money into his inmate account to enable him to do so.  *See Thornburgh v. Abbott*, 490 U.S. 401, 417-18 (1989) (explaining how cases applying second Turner factor reflect that it must be approached "sensibly and expansively," so as to encompass different practical alternatives that satisfy same broad underlying function); *Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006) (inmate had alternative to prison's limitation on number of free postage stamps by having "his friends or family send money, which [could] be used to purchase stamps from the commissary").  The defendants have satisfied the second *Turner* factor.

    **C.**    **Third Factor**

The defendants have submitted evidence that the Administrative Directives prohibiting blank greeting cards from being sent to inmates are necessary to prevent additional extensive searches of incoming mail for contraband.  If blank greeting cards were permitted to be mailed to inmates, especially in bulk, prison officials would have to

devote significantly more time inspecting and supervising the inspection of inmates' mail.  This additional inspection time could cause further delays in processing inmate mail.  Prison officials could also be required to assign staff members to investigate suspected incidents of bartering using items sent in from outside the prison, including blank greeting cards.  These tasks would burden both staff and prison resources.

Warden Murphy stated that accommodating the plaintiff's request to receive blank greeting cards from individuals outside of prison would interfere with the purpose of Administrative Directive 6.10 to minimize the opportunity for contraband to be sent into the prison and would overburden correctional staff with having to perform extensive searches of an increased volume of incoming property through the mail for contraband. In addition, permitting unsigned greeting cards to be mailed to inmates would also increase the likelihood of inmate barter or trade, gambling and thefts and inmate arguments and fighting, with the potential for injuries to both correctional staff and inmates.  (*See* Mem. Supp. Mot. Summ. J, Murphy Aff. ¶¶ 11-13, 18-20.)  The court defers to the experience and judgment of Warden Murphy.  *See Overton*, 539 U.S. at 135 ("When . . . consequences [such as reallocation of prison resources and correctional officers' ability to protect staff and inmates] are present, we are 'particularly deferential' to prison administrators' regulatory judgments.") (quoting *Turner*, 482 U.S. at 90).

The court concludes that accommodating the plaintiff's request to receive blank greeting cards in the mail from relatives and friends outside of prison would unduly burden prison staff and resources and potentially endanger the safety and security of inmates as well as prison staff.  *See Turner*, 482 U.S. at 92 (inmate's asserted rights

11

"can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike"). The third Turner factor is resolved in the defendants' favor.

### D. Fourth Turner Factor

The Supreme Court explained that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation" and "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Turner*, 482 U.S. at 90. The Court went on to clarify that "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable method of accommodating the claimant's constitutional complaint." *Id.* at 90-91. Rather, this factor weighs against the regulation if the inmate "can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." *Id.* at 91 (emphasis added).

The defendants are not aware of any obvious and easy alternatives that would further the prison's interests in safety and security and also accommodate the plaintiff's First Amendment rights under these circumstances. Nor has the plaintiff offered any alternatives. Thus, the plaintiff has not met the fourth *Turner* factor.

The defendants have asserted and substantiated a set of legitimate penological interests rationally related to the Administrative Directives. In addition, all of the other *Turner* factors support the conclusion that the challenged directives, as applied, were a constitutionally valid exercise of prison administrative authority. Accordingly, the court concludes that Administrative Directives 6.10 and 10.7 relied on by the defendants to reject the blank greeting card in the correspondence mailed to the plaintiff was rationally

related to the legitimate penological interest of maintaining safety and security within the prison.  The motion for summary judgment is granted on this ground as to the claims against defendants Murphy and Stolfi.

## IV.     Qualified Immunity

The defendants are also entitled to qualified immunity for the reasons set forth in their brief [Dkt. #208] at pages 35 to 39.

## V.      Conclusion

The Motion for Summary Judgment [**Dkt. No. 207**] filed by defendants Murphy and Stolfi is **GRANTED**.

**SO ORDERED.**

Dated at Hartford, Connecticut this 30th day of September, 2011.


/s/ Christopher F. Droney
Christopher F. Droney
United States District Judge